3:25-mj-00354

**DISTRICT OF OREGON, ss:**                    **AFFIDAVIT OF NATHAN HIBBS**

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Nathan Hibbs, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1.      I am a Task Force Officer (TFO) for the Federal Bureau of Investigation and have a special deputation to investigate and enforce violations of Title 18 and Title 21 of the United States Code, which includes firearm and controlled substances offenses.  I am a Police Detective employed by the City of Gresham Police Department, assigned as a criminal investigator to the Gresham Police Department (GPD) Investigations Division.  I am a sworn police officer and have been for more than 19 years.  I am currently assigned to the Multnomah County Sherriff's Office's (MCSO) Special Investigations Unit (SIU) investigating narcotics related crimes.  I have conducted multiple investigations into weapons offenses and drug trafficking offenses. Through this training and experience, I have become familiar with the manner in which drug traffickers operate to carry out their criminal activity.

2.      I submit this affidavit in support of a criminal complaint and arrest warrant for Jocsan Soto Montoya (**SOTO**), d.o.b. 07/xx/2004, for committing the felony offenses of:

> a.      Conspiracy to Distribute and Possess with Intent to Distribute 400 grams or more of a Mixture and Substance containing Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and,

> b.      Possession with Intent to Distribute 40 grams or more of a Mixture and Substance containing Fentanyl, a Schedule II controlled substance, in

violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B) (hereinafter the Target Offenses).

As set forth below, there is probable cause to believe, and I do believe, that **SOTO** committed the Target Offenses.

### Applicable Law

3.      21 U.S.C. § 841(a)(1) makes it unlawful for any person to knowingly or intentionally manufacture, distribute, or possess with intent to distribute a controlled substance. 21 U.S.C. § 841(b)(1)(B) provides that anyone who manufactures, distributes, or possesses with intent to distribute 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, is subject to a maximum term of 40 years' imprisonment, a potential mandatory minimum sentence of five years imprisonment, a fine of up to $5,000,000, and at least four years of supervised release.

4.      21 U.S.C. § 846 makes it unlawful to engage in a conspiracy to manufacture, distribute, or possess with intent to distribute a controlled substance. 21 U.S.C. § 841(b)(1)(A) provides that anyone who manufactures, distributes, or possesses with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, is subject to a maximum term of life imprisonment, a potential mandatory minimum sentence of 10 years imprisonment, a fine of up to $10,000,000, and at least five years of supervised release.

///

**Page 2 – Affidavit of Nathan Hibbs**

**Confidential Reliable Informant Statement**

5.      This investigation involves the use of a Confidential Reliable Informant (CRI). The CRI has provided information about fentanyl traffickers to SIU for more than one (1) year. The CRI's information and the resulting law enforcement directed actions have led to more than six (6) federal search warrants, arrests, and federal prosecutions.  The CRI has provided information to law enforcement in exchange for monetary compensation.  Based on my training and experience, I know that drug trafficking organizations often use violence, threats, and intimidation against its enemies, including against any cooperating witnesses and labels them as "rats, snitches, or informants."  Accordingly, to help protect the CRI, I am purposefully omitting details that if known to the DTO members or the public at large, would aid in the CRI's identification.  I have reviewed CRI's criminal history and found that CRI has no convictions for felonies or crimes of dishonesty.  Information provided by the CRI has been corroborated through surveillance, review of police reports and other investigative efforts.  Based on the investigation to date, I believe the CRI's information has been sufficiently corroborated and is truthful and accurate.

**Statement of Probable Cause**

6.      At the beginning of this investigation in October 2025, I learned from the CRI that they could purchase fentanyl by calling the cell phone number 503-xxx-7101.  The CRI told me the male who sold fentanyl and who was using this number identified himself by the name "RICHARD."

**Page 3 – Affidavit of Nathan Hibbs**

7.      Over the past 30 days, SIU members arranged three controlled buys of fentanyl using the CRI from RICHARD.  During each buy the CRI would contact the telephone number 503-xxx-7101 and arrange to purchase fentanyl at my direction.  During each buy the CRI was searched for contraband cash and narcotics and none was located.  The CRI was provided with pre-recorded MCSO SIU investigative funds in U.S. currency with which to purchase the fentanyl from RICHARD.  During each of the buys the CRI was surveilled both to the buy location and during the buys when the CRI would purchase the fentanyl from RICHARD.  During each buy the CRI was directed by RICHARD to a specific location in the City of Portland, Oregon.  At those predetermined locations the CRI was met by a person in a vehicle and the CRI entered the vehicle for a short time and then exited and returned to the CRI's vehicle.  Following the controlled buys the CRI was surveilled to a meet location and again searched for contraband cash and narcotics, none was found.  After each buy the CRI provided me with an amount of fentanyl wrapped in clear plastic.  The CRI told me the fentanyl was given to the CRI by RICHARD.  The fentanyl was tested using a Mobile Detect presumptive field test and during each instance the test indicated presumptive positive for the presence of fentanyl, a Schedule II controlled substance.  I have found such field tests to be reliable with subsequent forensic analysis repeatedly confirming the results.  The fentanyl in each case was lodged as evidence at MCSO Property.  During the first controlled buy the fentanyl dealer drove a Toyota Corolla on the two subsequent buys the dealer drove a grey Hyundai Elantra bearing Oregon trip permit NS168112.

**Page 4 – Affidavit of Nathan Hibbs**

8.      During the investigation I obtained a federal cell phone geolocation search warrant for the cell phone number the CRI had contacted for the controlled purchases. Additionally, I obtained a federal tracking warrant to install a tracker on the Hyundai used by the suspect during the controlled buys.  Both warrants were signed by the Honorable Judge Youlee You, United States Magistrate Judge.  Both warrants were subsequently executed.

9.      Investigators located the Hyundai parked regularly overnight at an apartment complex located at 1500 SW Pleasant View Drive, in Gresham, Oregon.

10.      On December 1, 2025, investigators set up surveillance at 1500 SW Pleasant View Drive in Gresham, Oregon.   After a time a male, later identified as **SOTO**, appeared from an unknown apartment and he was not carrying any items.  **SOTO** entered the Hyundai and drove away from the area.  Investigators surveilled **SOTO** as he drove to XXXXX SE Powell Court, Portland, Oregon.  At that location **SOTO** exited the vehicle and walked to apartment 15 and then entered the apartment.  After a short time, I observed **SOTO** exit the apartment and lock the apartment door with a key before walking away.  This time I noticed that **SOTO** was carrying a small soft sided black bag similar to a lunch bag as he exited the apartment.

11.      During our surveillance I contacted the CRI and requested they contact the same telephone number and request to purchase fentanyl from the person they knew as RICHARD. The CRI responded and told me that whoever was operating the phone agreed to sell the CRI fentanyl and directed the CRI to meet at a location in Portland, Oregon to complete the deal.  The CRI sent me a screenshot of the text message confirming the conversation.

 **Page 5 – Affidavit of Nathan Hibbs**

12.    Investigators surveilled **SOTO** as he drove west into Southeast Portland, Oregon. During his drive to the location, **SOTO** drove what I recognized as surveillance detection routes, that is, instead of driving normal major streets, he drove on side streets and through neighborhoods at varying speeds.  I have seen drug dealers use this method as a way to see if people are following them in an effort to detect law enforcement surveillance while they are selling drugs.  During the surveillance, investigators were not able to stay in visual sight of the vehicle and at times relied on the court authorized GPS device installed on the vehicle to track its movement.  Once **SOTO** reached the area of SE 42nd and Belmont, in Portland, Oregon, he drove in several square or rectangular patterns as he had done during the controlled buys.  On SE 42nd south of Belmont I saw his vehicle pull to the curb and a white male in his 40's or 50's exited the passenger seat of the vehicle.  The male had not previously been in the vehicle, and I believed **SOTO** had let this person into his car sometime when we did not have visual surveillance on him and that he just sold the male fentanyl, as this pattern was the same investigators had observed during the three controlled buys.

13.    After a short time, I saw the vehicle pulled to the curb and **SOTO** appeared to be on his cell phone.  I directed investigators to stop the vehicle.  **SOTO** was contacted and detained.  Using an online Spanish interpreting service with Spanish interpreter I read **SOTO his** constitutional *Miranda* rights from a prepared card.  When asked, **SOTO** told me there was about three ounces of fentanyl in the vehicle and he then gave us consent to search the vehicle.

14.    Investigators searched **SOTO's** vehicle and located the same black bag I had observed **SOTO** carrying when he exited apartment 15.  The bag was on the driver's floorboard

 **Page 6 – Affidavit of Nathan Hibbs**

of the vehicle.  Inside the bag investigators located nine (9) bags of suspected fentanyl and loose

cash.  A picture is below:



15.    An sample of the seized fentanyl was later tested using a Mobile Detect

presumptive test and the test indicated presumptive positive for fentanyl.  The fentanyl found in

the car weighed approximately 99.5 gross grams, which included the plastic bags it had been

found in.  A picture is below:

///

///

///

**Page 7 – Affidavit of Nathan Hibbs**



16.     I questioned **SOTO** about the apartment I had observed him exiting and he denied it was his apartment and would not tell me whose apartment it was.  Investigators then drove to XXXXX SE Powell Court, Portland, Oregon.  **SOTO** was with me in my vehicle.  As I drove, I noted **SOTO** spoke some English and was able to understand me and converse with me.  As we neared the apartment complex, I noticed he became visibly nervous.  As we parked in the parking lot, he admitted to me there would be two people in the apartment and said that was where he got his fentanyl.  When I asked him if one of the people in the apartment was his boss, he agreed with me.  I advised investigators that there were two people inside the apartment.

17.     Investigators knocked at the apartment door and identified themselves as police. No one answered the door and as we were concerned about the easy destruction of any fentanyl that could be inside, investigators unlocked the front door using a key seized from **SOTO** at the stop.  As the door opened, one male later identified as a 16-year old juvenile (JUVENILE), was

**Page 8 – Affidavit of Nathan Hibbs**

standing near the front door.  Investigators saw a second male, later identified as Carlos Montoya Giron (MONTOYA) peeked out of the bathroom and then after observing investigators he disappeared back into the bathroom.  Concerned MONTOYA was flushing fentanyl down the drain or toilet investigators moved into the apartment and detained JUVENILE and then called MONTOYA out of the bathroom and detained him as well.  SOTO was very concerned about either of the two men seeing him.

18.     I spoke to JUVENILE using an online Spanish language interpreting service, through the Spanish interpreter I read JUVENILE his constitutional *Miranda* rights from a prepared card.  JUVENILE told me he understood his rights.  JUVENILE denied living in the apartment and said he lived elsewhere but would not tell me the address.  When asked he denied consent to search the apartment.

19.     I then spoke to MONTOYA using the same Spanish language interpreter.  He told me he lived in the apartment by himself and he then signed a form providing Investigators with consent to search the apartment and his vehicle, which he said was in the parking lot.

20.     After receiving consent, Investigators searched the apartment and inside the refrigerator Investigators located a clear plastic container with suspected fentanyl inside it.  The fentanyl consisted of a large portion of what appeared to be a kilogram "brick" wrapped in plastic and tape.  The remainder was individually wrapped bindles of suspected fentanyl wrapped in clear plastic.  On the floor was a piece of cellophane approximately five feet long stretched in the area in front of the refrigerator.  Investigators noted three large tubs of Mannitol in the same area and a blender was on the floor with a white powder residue in it, that I suspected was

**Page 9 – Affidavit of Nathan Hibbs**

fentanyl. I know that Mannitol is used to mix with fentanyl in a blender (to "cut it") which has the effect of increasing the volume of the mixture and substance containing fentanyl that is available to sell. Investigators located respirators and rubber gloves in the same area. Under the sink were two tubs of acetone. On the counter was a large metal scale with white residue on it. Based on my training and experience I believed the suspects were cutting fentanyl and repackaging it for sale. In the bathroom I observed empty plastic gallon zip bags that appeared to have been washed out, and an empty cut open kilogram wrapper inside the tub. I noticed the tub was wet with water. The toilet appeared to be plugged. It appeared that someone was destroying evidence inside the bathroom.

21.     In a paper bag in the refrigerator investigators also located a Glock 9mm handgun in a paper bag and next to firearm in the bag was a 27-round magazine for the handgun. The magazine contained 12 rounds of 9mm ammunition. The firearm turned out to be stolen.

22.     I interviewed JUVENILE using the same Spanish language interpreting service and he admitted to me that he sold fentanyl in downtown Portland, Oregon and he said he had been selling fentanyl for one month and that he sells an ounce of fentanyl a day for $800.

23.     Using an online Spanish language interpreting service, I interviewed MONTOYA. I read MONTOYA his constitutional *Miranda* rights from a prepared card and at the end he told me he understood his rights. MONTOYA told me he did not know how much fentanyl was in his apartment. MONTOYA told me he purchases kilograms of fentanyl for $10,000. He told me he cuts the fentanyl with mannitol at a 10 to 1 ratio. He told me he sells ounces of fentanyl for $400. I asked him about the handgun, and he told me it was not his and he did not know who it

**Page 10 – Affidavit of Nathan Hibbs**

belonged to or how it got into the refrigerator.  He admitted to touching the gun before but would not tell me when.  He again told me it was his apartment and he was the only person who lived there.  Pictures of the approximately kilogram "brick" of fentanyl and firearm seized from the apartment are below:



24.    A sample of the suspected fentanyl found in the apartment was tested with a Mobile Detect field test and returned a positive result for fentanyl, a Schedule II controlled substance.  The fentanyl found in the apartment weighed approximately 1,974.5 grams, with packaging.  A picture is below:

///

///

///

**Page 11 – Affidavit of Nathan Hibbs**



25.     I interviewed **SOTO** further and he told me he had been in Portland for two or three months.  He said he had been selling fentanyl during that time and said he sold eight to ten ounces of fentanyl a day.  He said he received $1,500 a week from MONTOYA for selling fentanyl and said he received his fentanyl from MONTOYA.

26.     I very familiar with how fentanyl dealers operate, and I know that fentanyl traffickers are increasingly selling both fentanyl powder and counterfeit M30 prescription pills manufactured with fentanyl, a Schedule II controlled substance.  I know that fentanyl powder is typically a white to off-white powder.  Since different weights of powdered fentanyl sell for different amounts, I know that drug dealers selling fentanyl powder will often possess a scale to weigh the amount of powder fentanyl they are selling or buy it in prepackaged amounts ready for sale.  I also know drug dealers selling powdered fentanyl, which they will often possess in larger

**Page 12 – Affidavit of Nathan Hibbs**

amounts, will often possess additional packaging materials to repackage the drugs they are selling to their customer. Depending on their level of addiction, I know that a user of powdered fentanyl will typically buy it in quantities of less than a gram up to several grams at a time and will then use it in quantities of less than or around a 1/10th of a gram. I know that street dealers of powdered fentanyl will often buy fentanyl in larger quantities and then break off and sell it in smaller qualities of a gram or less. I know that 2 milligrams of fentanyl can be a potentially fatal dose for an adult. I know that a person possessing more than 10 grams of fentanyl powder does not possess it for personal use but rather such a quantity clearly indicates that it is possessed for purposes of further distribution.

27.    **SOTO** and MONTOYA were transported to jail and lodged on federal probable cause.

### Conclusion

28.    Based on the foregoing, I have probable cause to believe, and I do believe, that Jocsan Soto Montoya (**SOTO**) committed the Target Offenses and I therefore request that the Court issue a criminal complaint and arrest warrant for **SOTO** for committing the Target Offenses.

29.    Prior to being submitted to the Court, this affidavit, the accompanying complaint and the arrest warrant were all reviewed by Assistant United States Attorney (AUSA) Scott Kerin, and AUSA Kerin advised me that in his opinion the affidavit and complaint are legally

**Page 13 – Affidavit of Nathan Hibbs**

and factually sufficient to establish probable cause to support the issuance of the requested

criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
Nathan Hibbs, Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone at ___8:48 p.m.___ on December 2, 2025.

/s/ Jeff Armistead
HONORABLE JEFFREY ARMISTEAD
UNITED STATES MAGISTRATE JUDGE

**Page 14 – Affidavit of Nathan Hibbs**